**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANTONIO LOPEZ SERNA,

      Plaintiff,

    v.                                                                          Civ. No. 12-853 MV/KK

WILLIAM SHANNON *et al.*,

      Defendants.

<u>**MAGISTRATE JUDGE'S PROPOSED FINDINGS**</u>
<u>**AND RECOMMENDED DISPOSITION**</u>

THIS MATTER comes before the Court on the following motions filed by the parties:

(1)    *Martinez* Report and Motion for Summary Judgment by Defendants Dr. Barry Beaven and Dr. William Shannon (Doc. 58), filed April 14, 2014;

(2)    Plaintiff's Motion for Jury Trial (Doc. 61), filed June 11, 2014;

(3)    Plaintiff's Motion for Summary Judgment (Doc. 62), filed June 11, 2014;

(4)    Plaintiff's Motion to Request a Trial (Doc. 65), filed July 29, 2014;

(5)    Plaintiff's Motion to Address Medical Care and Concerns (Doc. 67), filed August 11, 2014;

(6)    Plaintiff's Motion for Preliminary Injunction (Doc. 68), filed August 11, 2014;

(7)    Plaintiff's Motion for Appointment of Counsel (Doc. 73), filed October 15, 2014;

(8)    Plaintiff's Motion for Ruling (Doc. 76), filed October 27, 2014;

(9)    Plaintiff's Motion for Summary Judgment (Doc. 78), filed November 6, 2014;

(10)    Plaintiff's Motion for Summary Judgment (Doc. 79), filed November 13, 2014;

(11)    Plaintiff's Motion to Set Trial Date (Doc. 83), filed December 11, 2014;

(12)    Plaintiff's Motion for Summary Judgment (Doc. 84), filed December 15, 2014;

(13)    Plaintiff's Motion for Appointment of Counsel (Doc. 85), filed December 31, 2014; and,

(14)    Plaintiff's Motion for Telephonic Hearing (Doc. 86), filed January 23, 2015.

By an Order of Reference filed on March 4, 2015 (Doc. 89), this matter was referred to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case.   The Court, having reviewed the parties' submissions and the relevant law, and being otherwise fully advised, concludes that the Motion for Summary Judgment by Defendants Dr. Barry Beaven and Dr. William Shannon (Doc. 58) is well taken, and recommends that it be GRANTED.   The Court further recommends that Plaintiff's thirteen additional pending motions listed above be DENIED AS MOOT.

## I.  Introduction and Procedural History

This case arises out of Defendants' provision of medical care to Plaintiff during his incarceration at the Penitentiary of New Mexico ("PNM") and Central New Mexico Correctional Facility ("CNMCF").   (Docs. 6, 10, 33, 74.)   Specifically, Plaintiff alleges that Dr. Shannon at PNM, and Dr. Beaven at CNMCF, were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution, because they failed to properly treat pain in his left shoulder and low back.   (Docs. 6, 33.)   Since October 15, 2014, Plaintiff has been incarcerated at the Northeast New Mexico Correctional Facility ("NENMCF"). (Doc. 74.)

Plaintiff filed this lawsuit on August 3, 2012, and has amended his complaint twice, on September 7, 2012 and September 24, 2013.   (Docs. 1, 6, 33; *see* Doc. 34 (allowing Plaintiff to file second amended complaint).)   The Court has entered a number of previous orders, most notably an order:  (1) dismissing Plaintiff's original complaint regarding injuries incurred to his left shoulder in 2009, due to the expiration of the applicable statute of limitations; and, (2)

dismissing Plaintiff's claims against former Defendant James Lopez, for failure to plead personal participation in the alleged constitutional violations at issue.  (Doc. 21.)  The Court has also denied several motions to appoint counsel.[1]  (*See* Docs. 21, 22, 31, 35, 49.)  On April 14, 2014, Defendants filed a *Martinez* report in which they incorporated a motion for summary judgment, and this motion is fully briefed.  (Docs. 58, 59, 60.)  In compliance with this Court's order, Defendants supplemented their *Martinez* report on November 14, 2014.  (Doc. 80.)  Plaintiff, in turn, has filed thirteen motions since Defendants filed their original *Martinez* report, including three motions for trial (Docs. 61, 65, 83), four motions for summary judgment (Docs. 62, 78, 79, 84), two motions for injunctive relief (Docs. 67, 68), two motions to appoint counsel (Docs. 73, 85), a motion for a ruling (Doc. 76), and a motion for a telephonic hearing.  (Doc. 86.)  All of these motions are now before the Court.

## II.  Defendants' Motion for Summary Judgment

The Court will first consider Defendants' summary judgment motion.  Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

---

[1] The Court did refer Plaintiff's case to a selection committee pursuant to its *Pro Bono* Plan.  (Doc. 22.)  However, the committee voted against referring the case for *pro bono* representation.  (Doc. 23.)

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  For purposes of summary judgment, a prisoner's pleading is treated as an affidavit if it alleges specific facts based on the prisoner's personal knowledge and has been sworn under penalty of perjury.  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  "A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."  *Id.*  However, "it is not the proper function of the district court to assume the role of advocate for the *pro se* litigant."  *Id.*

When reviewing a motion for summary judgment, the Court must keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue of material fact exists, requiring a trial.  *Anderson*, 477 U.S. at 249.  Second, the Court must draw all reasonable inferences in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999).  Finally, the Court cannot decide credibility issues.  *Anderson*, 477 U.S. at 255.  "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor."  *Id*. at 257.

### A.    Proposed Findings of Fact

Viewing the record evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court proposes the following findings of fact:

1.      Plaintiff dislocated his left shoulder in March 2009.  Plaintiff underwent surgery in May 2009 to repair the dislocation.  (Doc. 78 at 8-9; Doc. 79 at 4; Doc. 80-2 at 2.)

2.      X-rays were taken of Plaintiff's lumbar spine and right shoulder in June 2009, and the results of these x-rays were normal.  (Doc. 80-2 at 3.)

3.      X-rays were taken of Plaintiff's left shoulder and right scapula in April 2010.  (Doc. 80-2 at 4.)  The results of the x-rays of Plaintiff's right scapula were normal.  (*Id.*)  The x-rays of Plaintiff's left shoulder revealed narrowing of joint space, deformity of the humerus suggesting old trauma, and multiple opacities suggesting foreign bodies.[2]  (*Id.*)  The radiologist diagnosed Plaintiff with mild degenerative joint disease, or osteoarthritis,[3] of the left shoulder.  (*Id.*)

4.      X-rays were taken of Plaintiff's lumbar spine in May 2010.  (Doc. 80-2 at 5.)  The results of these x-rays were normal.[4]  (*Id.*)

5.      Defendant Dr. William Shannon was employed as a physician at PNM from February 1, 2011 to December 6, 2012.  (Doc. 58-2 ¶ 2.)  When Dr. Shannon began working at PNM, Plaintiff had been prescribed a therapy band,[5] was receiving 1500 milligrams of Neurontin twice daily, and was awaiting consultation with an outside physical therapist to treat his left shoulder pain.  (Doc. 58-2 ¶ 3; Doc. 58-6 at 11.)

---

[2] In various pleadings, Plaintiff has asserted that x-rays show "bone fragments" in his left shoulder.  (*See, e.g.*, Doc. 61 at 1; Doc. 62 at 2; Doc. 64 at 1.)  These assertions may be based on the April 2010 x-rays' results noting "multiple opacities suggesting foreign bodies."  (Doc. 80-2 at 4.)  However, subsequent x-rays of the same shoulder indicate that the foreign bodies in question are actually metallic surgical clips.  (Doc. 80-2 at 2, 6, 10.)

[3]     Degenerative joint disease is also known as osteoarthritis.  *See* www.merriam-webster.com/medlineplus/degenerative joint disease.

[4] In his sworn Motion for Jury Trial, Plaintiff attested to his belief that a previous x-ray of his low back showed him to have "five rotting dis[c]s."  (Doc. 61 at 1.)  The basis of this belief is unclear, particularly in light of another set of lumbar spine x-rays in February 2014, which showed only "mild degenerative changes at L4-L5."  (Doc. 58-6 at 8.)

[5] According to Plaintiff, unidentified prison personnel subsequently removed the therapy band from his cell during a "shake down."  (Doc. 59 at 1.)

6.      Dr. Shannon saw Plaintiff on or about February 4, 2011, and prescribed an analgesic balm three times daily for 30 days for his left shoulder pain.  (Doc. 58-2 ¶; Doc. 58-3 at 5.)

7.      Dr. Shannon saw Plaintiff again on March 2, 2011 as part of a chronic care program, at which time he reviewed Plaintiff's ongoing treatment for his left shoulder pain.  (Doc. 58-2 ¶ 7; Doc. 58-3 at 6.)

8.      On March 15, 2011, a physician's assistant renewed Plaintiff's prescription for 325 milligrams of Tylenol three times daily as needed for 120 days.  (Doc. 58-2 ¶ 9; Doc. 58-6 at 14.) Plaintiff has Hepatitis C and felt that Tylenol was bad for his liver.  (Doc. 59 at 2.)

9.      On March 27, 2011, Plaintiff wrote a note to "medical," stating that he needed someone to look at his left shoulder due to pain.  (Doc. 87 at 15.)  An unidentified person marked this note as received on March 28, 2011.  (*Id.*)

10.     On April 11, 2011, Dr. Shannon saw Plaintiff and renewed his prescription for 1500 milligrams of Neurontin twice daily for 90 days to treat his left shoulder pain.  (Doc. 58-2 ¶ 8; Doc. 58-3 at 9; Doc. 58-6 at 14.)

11.     Plaintiff saw an outside physical therapist for his left shoulder pain on May 16, 2011. (Doc. 58-2 ¶ 8; Doc. 58-3 at 11.)

12.     Plaintiff submitted a health service request form on June 26, 2011 regarding left shoulder pain from his physical therapy exercises.  (Doc. 87 at 14.)  On June 27, 2011, Plaintiff saw a nurse, who counseled him regarding how to do the exercises.  (*Id.*)  The nurse made the following notes in Plaintiff's medical record:  "Will schedule with provider for further evaluation.  Requests x-ray.  Needs renewal of Neurontin."  (*Id.*)

13.     On July 8, 2011, Dr. Shannon renewed Plaintiff's prescription for 1500 milligrams of Neurontin twice daily for 90 days, and on July 15, 2011, a physician's assistant renewed

Plaintiff's prescription for 325 milligrams of Tylenol three times daily for 180 days.  (Doc. 58-2 ¶ 9; Doc. 58-6 at 15.)

14.     Dr. Shannon saw Plaintiff on August 12, 2011 as part of a chronic care program.  (Doc. 58-2 ¶ 10; Doc. 58-3 at 15-16.)  Plaintiff did not complain of shoulder pain at this appointment. (*Id.*)

15.     On September 30, 2011, a physician's assistant renewed Plaintiff's prescription for an analgesic balm twice daily for 60 days.  (Doc. 58-2 ¶ 10; Doc. 58-6 at 16.)

16.     On or about October 29, 2011, Dr. Shannon decided to taper off Plaintiff's Neurontin prescription.  (Doc. 58-2 ¶¶ 11-12.)  Dr. Shannon gave the following reasons for this decision: (1) Neurontin can be used to get "high" in high doses; (2) Neurontin has a history of abuse among inmates at NMDOC facilities; and, (3) Neurontin is typically used to address neuropathic pain, while Plaintiff's shoulder pain was musculoskeletal.  (*Id.*)  Once Plaintiff was tapered off of Neurontin, on November 9, 2011, Dr. Shannon gave Plaintiff a prescription for 500 milligrams of Naprosyn,[6] a non-steroidal anti-inflammatory drug ("NSAID"), twice daily for 90 days.  (Doc. 58-2 ¶ 12; Doc. 58-6 at 17-18.)  According to Plaintiff, this medication was to treat arthritis. (Doc. 59 at 2.)

17.     A nurse practitioner renewed Plaintiff's prescription for an analgesic balm twice daily for 60 days on December 6, 2011.  (Doc. 58-2 ¶ 13; Doc. 58-6 at 18.)

18.     Plaintiff saw Dr. Shannon on December 12, 2011 as part of a chronic care program. (Doc. 58-2 ¶ 13; Doc. 58-4 at 2-3.)  At this appointment, Dr. Shannon noted Plaintiff's recent Neurontin taper and a "fair" degree of control regarding his left shoulder pain.  (*Id.*)

---

[6] Naprosyn is a trade name for the medication naproxen.  *See* www.pdrhealth.com/drugs/naprosyn.

19.     On December 20, 2011, Plaintiff submitted a health service request form regarding low back pain, stomach pain, and a problem with his right ankle.  (Doc. 58-3 at 18.)  On December 21, 2011, Plaintiff saw a nurse, who scheduled an appointment with a provider.  (*Id.*)

20.     Plaintiff saw a nurse practitioner for left shoulder and low back pain on January 6, 2012.  (Doc. 58-2 ¶ 13; Doc. 58-4 at 5; Doc. 58-6 at 18-19.)   The nurse practitioner renewed his prescriptions for an analgesic balm twice daily for 120 days, and for 500 milligrams of naproxen twice daily as needed for 120 days.  (*Id.*)  The nurse practitioner also reviewed range-of-motion exercises with Plaintiff.  (*Id.*)

21.     On February 2, 2012, Plaintiff submitted a health service request form regarding shoulder pain, on which he requested to see Dr. Shannon.  (Doc. 58-4 at 7.)   On February 3, 2012, Plaintiff saw a nurse, who noted that Plaintiff was on Dr. Shannon's "list" for February 3, 2012 and referred Plaintiff to a provider.  (*Id.*)

22.     On February 7, 2012, a nurse practitioner discontinued Plaintiff's naproxen prescription, and instead prescribed 600 milligrams of ibuprofen, another NSAID, three times daily as needed for 120 days.  (Doc. 58-6 at 19.)   In his sworn November 6, 2014 Motion for Summary Judgment, Plaintiff attested that ibuprofen upset his stomach and was ineffective.  (Doc. 78 at 3-4.)  He also felt that ibuprofen was bad for his liver.  (*Id.*)

23.     Plaintiff saw Dr. Shannon on February 22, 2012, at which time Dr. Shannon ordered x-rays of Plaintiff's left shoulder and a consultation with an outside orthopedist.  (Doc. 58-2 ¶ 14; Doc. 58-4 at 10; Doc. 58-6 at 20.)

24.     On February 27, 2012, as part of a chronic care program, Plaintiff saw a nurse practitioner.  (Doc. 58-2 ¶ 14; Doc. 58-4 at 8-9.)  At this appointment, the nurse practitioner reviewed the treatment Plaintiff was receiving for his shoulder pain, *i.e.*, ibuprofen, analgesic

8

balm, and exercises, and noted a "good" degree of control regarding his chronic shoulder pain. (*Id.*).

25.     X-rays of Plaintiff's left shoulder were taken on March 3, 2012.  (Doc. 80-2 at 6.) According to Dr. James Piko, who read the x-rays, they revealed no fractures or dislocations, preserved joint space, an old Hill Sachs deformity, and surgical clips.[7]  (*Id.*)  Dr. Piko diagnosed Plaintiff with "old probable dislocation changes" of the left shoulder.  (*Id.*)

26.     On March 18, 2012, Plaintiff submitted a health service request form regarding left shoulder pain, on which he requested an appointment with a specialist.  (Doc. 58-4 at 11.)  On March 19, 2012, Plaintiff saw a nurse, who scheduled an appointment with a provider.  (*Id.*)  The nurse made the following note in Plaintiff's medical record:  "security staff advises that inmate has no problem going to rec and doing push-ups."[8]  (*Id.*)

27.     On March 23, 2012, Plaintiff saw a nurse practitioner, who reviewed Plaintiff's shoulder exercises and renewed his prescription for an analgesic balm three times daily as needed for 120 days.  (Doc. 58-2 ¶ 15; Doc. 58-4 at 12; Doc. 58-6 at 21.)

28.     Plaintiff saw an unidentified health care provider on April 16, 2012.  (Doc. 58-2 ¶ 15; Doc. 58-4 at 13.)   At this appointment, the provider reviewed the treatment Plaintiff was receiving for his shoulder pain.  On the same date, Dr. Shannon ordered unidentified medical staff to follow up on his February 22, 2012 order for Plaintiff to see an outside orthopedic specialist.  (Doc. 58-2 ¶ 15; Doc. 58-6 at 22.)  According to Dr. Shannon, consultations with

---

[7] Dr. Sann Gossum, an outside orthopedic specialist who saw Plaintiff in June 2012, appears to have read Plaintiff's March 2012 x-rays differently than Dr. Piko did in two respects.  (Doc. 80-2 at 10.)  Specifically, he saw "complete loss of joint space" and "no obvious large Hill Sachs lesion."  (*Id.*)

[8] In his unsworn response to Defendants' summary judgment motion, Plaintiff asserted that the exercise routine recommended by the outside physical therapist included one or two push-ups.  (Doc. 59 at 2.)

medical providers outside the correctional system were often delayed, "particularly where the treatment is non-emergent." (Doc. 58-2 ¶ 7.)

29.     On May 1, 2012, Plaintiff saw a nurse practitioner, who renewed his prescriptions for an analgesic balm three times daily for 120 days, and for Tylenol, 325 milligrams three times daily as needed for 90 days. (Doc. 58-2 ¶ 16; Doc. 58-4 at 15-16; Doc. 58-6 at 22.)

30.     Plaintiff submitted a health service request form regarding left shoulder and low back pain on May 24, 2012. (Doc. 58-4 at 18.) On May 25, 2012, Plaintiff saw a nurse, who advised him that an off-site appointment was being scheduled for him. (*Id.*)

31.     On June 5, 2012, an unidentified health care provider renewed Plaintiff's prescription for 600 milligrams of ibuprofen three times daily as needed for 90 days. (Doc. 58-6 at 23.)

32.     Plaintiff saw Dr. Sann Gossum, an outside orthopedic specialist, regarding his left shoulder pain on June 12, 2012. (Doc. 80-2 at 10-12.) Dr. Gossum took Plaintiff's history, examined him, reviewed his x-rays, and diagnosed him with degenerative joint disease of the left shoulder. (*Id.* at 10.) In his report, Dr. Gossum stated that

> [a]t this time Mr. Serna is not interested in hearing anymore about surgical options for management of this condition. His sole request is that he be placed back onto Neurontin as this gave him significant relief in the past. I have authorized him to go back on that medication. If any consideration is given in the future to surgical intervention, he would likely be served best at the University of New Mexico and I have suggested that he see Dr. Eric Benson there.

(*Id.* at 10-11.) On the Provider Consultation Report that PNM provided to him, Dr. Gossum made the following notes: "No interest in surgery. Neurontin 1500 m[illigrams by mouth twice daily]. Schedule app[ointmen]t [with] Dr. Benson at UNM if [N]eurontin not successful." (*Id.* at 12.)

33.     On June 20, 2012, Dr. Shannon gave Plaintiff prescriptions for 300 milligrams of Neurontin twice daily for seven days, and then 600 milligrams of Neurontin twice daily for 90

days.   (Doc. 58-6 at 23.)   Dr. Shannon placed Plaintiff back onto Neurontin pursuant to Dr. Gossum's recommendation, but increased the dose gradually because he was "wary of the amount to provide due to its potential for abuse."  (Doc. 58-2 ¶ 16.)

34.     Plaintiff submitted a health service request form regarding low back pain on July 2, 2012. (Doc. 58-4 at 19.)  Plaintiff saw a nurse the same day, and asked to have his Neurontin dose increased.  (*Id.*)  The nurse scheduled a provider appointment.  (*Id.*)

35.     On July 16, 2012, a nurse practitioner renewed Plaintiff's prescription for 325 milligrams of Tylenol twice daily for 90 days, and discontinued his ibuprofen prescription because Plaintiff was not using it.  (Doc. 58-6 at 24.)

36.     Plaintiff wrote an inmate informal complaint and grievance dated July 18, 2012, requesting to get his low back x-rayed, to see if back surgery would help him, and to see Dr. Shannon, because he hurt his low back by "sleep[ing] wrong."  (Doc. 6 at 12-13.)  There is no indication in the record regarding who, if anyone, received Plaintiff's July 18, 2012 complaint and grievance.  (*Id.*)

37.     Plaintiff saw a nurse practitioner as part of a chronic care program on July 19, 2012, and asked to have his Neurontin dose increased to 1500 milligrams twice daily.  (Doc. 58-4 at 21-22.)  The nurse practitioner noted that Plaintiff's chronic shoulder pain was under a "fair" degree of control.  (*Id.*)

38.     On July 23, 2012, a nurse practitioner discontinued Plaintiff's Tylenol prescription and renewed his prescription for 600 milligrams of ibuprofen three times daily for 90 days, because Plaintiff "prefer[red] ibuprofen."  (Doc. 58-6 at 24.)

39.     Plaintiff wrote an inmate informal complaint and grievance dated July 28, 2012, requesting to see Dr. Shannon for shoulder and low back pain.  (Doc. 6 at 9, 11.)  There is no

indication in the record regarding who, if anyone, received Plaintiff's July 28, 2012 complaint and grievance.  (*Id.*)

40.     On July 30, 2012, Dr. Shannon increased Plaintiff's Neurontin prescription to 900 milligrams twice daily for 90 days.  (Doc. 58-2 ¶ 17; Doc. 58-6 at 25.)  Dr. Shannon believed that a dose any higher than this would pose an "increased risk of abuse."  (Doc. 58-2 ¶ 17.)

41.     Plaintiff was transferred to CNMCF on September 11, 2012.  (Doc. 58-2 ¶ 18.)

42.     Defendant Dr. Barry Beaven has been employed as a physician at CNMCF from September 2011 to the present.  (Doc. 58-1 ¶ 3.)

43.     On the day Plaintiff arrived at CNMCF, a nurse evaluated him and noted that he complained of left shoulder pain.  (Doc. 58-5 at 3.)  At that time, he was taking 900 milligrams of Neurontin twice daily.  (Doc. 58-1 ¶ 5; Doc. 58-4 at 24; 58-6 at 25.)

44.     On September 12 and 14, 2012, Plaintiff submitted health service request forms regarding left shoulder and low back pain.  (Doc. 58-5 at 1-2.)  On these forms, an unidentified person indicated that Plaintiff was scheduled for a provider appointment.  (*Id.*)

45.     Plaintiff submitted another health service request form regarding left shoulder and low back pain on September 27, 2012.  (Doc. 58-5 at 4.)  On September 29, 2012, Plaintiff saw a nurse, who noted that he was receiving 900 milligrams of Neurontin twice daily, gave him a back exercise handout, and scheduled an appointment for him with Dr. Beaven.  (Doc. 58-1 ¶ 7; Doc. 58-5 at 4.)

46.     Plaintiff saw Dr. Beaven on October 4, 2012.  (Doc. 58-1 ¶ 7; Doc. 58-5 at 11-12; Doc. 58-6 at 25.)  At this appointment, Plaintiff sought an increase in his Neurontin prescription.  (*Id.*)  Dr. Beaven maintained Plaintiff's Neurontin prescription at 900 milligrams twice daily, but also

prescribed 600 milligrams of ibuprofen three times daily for 90 days to further treat his shoulder and low back pain.  (*Id.*)

47.    Plaintiff wrote an inmate informal complaint and grievance dated October 6, 2012, requesting a prescription for 1500 milligrams of Neurontin twice daily, and complaining of pain in his left shoulder, right knee, and right foot.  (Doc. 87 at 4-6.)  There is no indication in the record regarding who, if anyone, received Plaintiff's October 6, 2012 complaint and grievance. (*Id.*)

48.    Dr. Beaven renewed Plaintiff's prescription for Neurontin, 900 milligrams twice daily, on November 16, 2012.  (Doc. 58-1 ¶ 8; Doc. 58-6 at 25.)

49.    On December 21, 2012, Plaintiff submitted a health service request form regarding left shoulder pain, and saw a nurse, who scheduled a provider visit.  (Doc. 87 at 19.)

50.    Plaintiff wrote an inmate informal complaint and grievance dated December 23, 2012, requesting a prescription for 1500 milligrams of Neurontin twice daily.  (Doc. 87 at 17-18.) There is no indication in the record regarding who, if anyone, received Plaintiff's December 23, 2012 complaint and grievance.  (*Id.*)

51.    On January 2, 2013, an unidentified health care provider renewed Plaintiff's prescription for 600 milligrams of Motrin[9] twice daily as needed for 90 days.  (Doc. 58-7 at 1.)  On the same date, Plaintiff wrote an inmate informal complaint and grievance requesting a prescription for 1500 milligrams of Neurontin twice daily.  (Doc. 87 at 20-21.)  There is no indication in the record regarding who, if anyone, received Plaintiff's January 2, 2013 complaint and grievance.

---

[9] Motrin is a trade name for ibuprofen.  *See* www.pdrhealth.com/drugs/motrin-ib.

52.     Plaintiff submitted a health service request form regarding left shoulder pain on January 16, 2013.  (Doc. 87 at 22.)  On January 17, 2013, he saw a nurse, who noted a plan to refer Plaintiff to a provider.  (*Id.*)

53.     On January 28, 2013, Plaintiff submitted a health service request form regarding left shoulder pain.  (Doc. 87 at 23.)  On January 29, 2013, he saw a nurse, who noted a plan to refer Plaintiff to a medical provider, and advised Plaintiff to continue taking his medications as prescribed.  (*Id.*)

54.     Dr. Beaven was aware from Plaintiff's psychiatric records that Plaintiff had a history of addiction and was at this time struggling with cravings to abuse drugs.  (Doc. 58-1 ¶ 9; Doc. 58-7 at 10-12.)  Plaintiff's repeated requests for an increased Neurontin prescription, when he was also taking ibuprofen, caused Dr. Beaven to believe that Plaintiff appeared to be drug-seeking.[10] (Doc. 58-1 ¶ 9.)  Dr. Beaven, like Dr. Shannon, was aware that Neurontin can be used to get "high" in high doses, that Neurontin has a history of abuse among NMDOC inmates, and that Neurontin is typically used to address neuropathic pain, while Plaintiff's shoulder pain was musculoskeletal.  (Doc. 58-1 ¶ 6.)  Thus, when Dr. Beaven saw Plaintiff on February 21, 2013 as part of a chronic care program, he reduced Plaintiff's Neurontin prescription from 900 milligrams to 300 milligrams twice daily for 90 days.  (*Id.*; Doc. 58-7 at 1.)

55.     On March 3, 2013, Plaintiff overdosed on several different prescription medications he had saved.  (Doc. 58-1 ¶ 10; Doc. 58-5 at 22-24; Doc. 58-7 at 2-4, 14-16.)  These medications did not include Neurontin.  (Doc. 58-7 at 14.)  Plaintiff initially indicated that the overdose was a

---

[10] In his sworn November 13, 2014 Motion for Summary Judgment, Plaintiff denied that he was drug-seeking, explaining that if he wanted to use drugs, he could get "the real deal" in prison.  (Doc. 79 at 2.)  For purposes of Defendants' summary judgment motion, the Court accepts Plaintiff's denial as true.  *Hunt*, 526 U.S. at 550-55.  However, Plaintiff has presented no evidence to contradict Dr. Beaven's testimony that he believed Plaintiff appeared to be drug-seeking, and that he had reasons to do so.

suicide attempt, but he later told an unidentified psychiatric provider that he was trying to get high.  (Doc. 58-7 at 16.)

56.     As a result of Plaintiff's drug overdose, Dr. Beaven decided to discontinue Plaintiff's Neurontin prescription altogether.  (Doc. 58-1 ¶¶ 10-11; Doc. 58-5 at 24; Doc. 58-7 at 4-5.)  He tapered Plaintiff off of Neurontin by the end of March 2013, (*id.*), and instead prescribed 800 milligrams of ibuprofen three times daily for three weeks, and an analgesic balm twice daily for 30 days, to treat Plaintiff's left shoulder and low back pain.  (*Id.*)

57.     Plaintiff saw a nurse on April 25, 2013, and asked for "any experimental drugs you have" or "anything interesting that nobody else wants."  (Doc. 58-1 ¶ 12; Doc. 58-5 at 24.)  This caused Dr. Beaven to believe that Plaintiff was still drug-seeking.  (Doc. 58-1 ¶ 12.)

58.     On May 3, 2013, Dr. Beaven renewed Plaintiff's prescription for 500 milligrams of Naprosyn twice daily for 90 days.  (Doc. 58-1 ¶ 12; Doc. 58-7 at 6.)  This medication was discontinued at Plaintiff's request after a chronic care visit on July 18, 2013.  (Doc. 58-1 ¶ 12; Doc. 58-6 at 1-2; Doc. 58-7 at 7.)

59.     Plaintiff wrote an inmate informal complaint regarding shoulder pain dated September 5, 2013, requesting x-rays and to be placed back on Neurontin.  (Doc. 87 at 24.)  Plaintiff also wrote a note to an unidentified person dated September 5, 2013, requesting "x-rays to see how the shoulder is[,] what pain medication is available and surgery."  (*Id.* at 1.)  This note is date-stamped December 30, 2013.  (*Id.*)  There is no indication in the record regarding who, if anyone, received Plaintiff's September 5, 2013 complaint or handwritten note.  (*Id.*)

60.     In his second amended complaint filed September 24, 2013, Plaintiff stated under oath that he was "plan[n]ing hopefully to be elsewhere by the end of the year[.  A]fter I see where I end up and [I']m settled down [I']ll do the surgery."  (Doc. 33 at 4.)  His requested relief

15

included "[t]o continue my Neurontin 1500 [milligrams] in the morning and 1500 [milligrams] at night," but did not include surgery.  (*Id.* at 5.)

61.    On February 28, 2014, after Plaintiff filed his second amended complaint, Plaintiff received another x-ray of his lumbar spine, which revealed "mild degenerative changes at L4-L5," and no other concerns.  (Doc. 58-6 at 8.)  The previous day, Dr. Beaven had renewed Plaintiff's prescription for 500 milligrams of Naprosyn twice daily to treat Plaintiff's shoulder and low back pain.[11]  (Doc. 58-7 at 8.)

### B.    Legal Analysis

 "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("Prison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of prisoners in their custody.").  However,

> an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06; *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008); *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006); *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

---

[11] The Court notes that, to preserve patient confidentiality, Defendants produced only medical records relating to Plaintiff's complaints in the instant case.  (Doc. 58-1 ¶ 4; Doc. 58-2 ¶ 3.)  The record evidence does not, therefore, reflect any treatment Plaintiff received for medical conditions other than shoulder and low back pain, except to the extent that such treatment also related to his shoulder or low back pain, or was provided at the same time as treatment for his left shoulder or low back pain.  Also, the medical records in evidence regarding treatment provided after the filing of Plaintiff's second amended complaint are incomplete.  (*See generally* Decs. 58, 69, 80.)

"Deliberate indifference has objective and subjective components." *Callahan*, 471 F.3d at 1159; *Self*, 439 F.3d at 1230; *Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993). Regarding the objective component, "[t]he prisoner must first produce objective evidence that the deprivation at issue was in fact sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Furthermore, "a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (citations omitted).

"The subjective prong of the deliberate indifference test," in turn, "requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. Deliberate indifference is analogous to criminal recklessness, "which makes a person liable when [he] consciously disregards a substantial risk of serious harm." *Id.* at 752; *Self*, 439 F.3d at 1231. Thus,

> [t]he subjective component is satisfied if the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference.

*Id.*; *Self*, 439 F.3d at 1231; *see Callahan*, 471 F.3d at 1159 ("To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.").

"The subjective prong is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232. Moreover, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state

a constitutional violation." *Self*, 439 F.3d at 1231; *Perkins*, 165 F.3d at 811; *see Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006)[12] ("disagreements with the treatment provided by prison medical staff" do not constitute deliberate indifference); *Barron v. Pohlman*, 122 F. App'x 416, 419 (10th Cir. 2005) ("a prisoner's difference of opinion with prison medical personnel regarding the type of treatment he should receive" does not constitute deliberate indifference). A prisoner does not have an Eighth Amendment "right to a particular course of treatment." *Callahan*, 471 F.3d at 1160; *see also Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (plaintiff's claims that he needed additional medication and specialist's treatment were "insufficient to establish a constitutional violation").

### 1.   Dr. William Shannon

Dr. Shannon argues that he is entitled to summary judgment on Plaintiff's Eighth Amendment claims because, as a matter of law, he was not deliberately indifferent to Plaintiff's serious medical needs. (Doc. 58 at 12-14.) During the time Dr. Shannon provided medical care to Plaintiff at PNM, from February 1, 2011 to September 11, 2012, the undisputed record evidence shows that Dr. Shannon provided, or was aware that others provided, the following treatment for Plaintiff's shoulder and low back pain:   back exercises, a therapy band, x-rays of his left shoulder, consultations with an outside physical therapist and an outside orthopedic specialist, and regularly renewed prescriptions for non-narcotic pain relievers, including analgesic balm, Tylenol, Naprosyn, and ibuprofen. (Section II.A. ¶¶ 5-41, *supra*.) Plaintiff has also failed to dispute that he received various but not continuous dosages of Neurontin, including 1500 milligrams twice daily from February 1, 2011 to October 29, 2011, 300 milligrams twice daily for seven days in late June 2012, 600 milligrams twice daily from the end of June to July

---

[12] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

30, 2012, and 900 milligrams twice daily from July 30, 2012 to September 11, 2012, when he was transferred to CNMCF.  (*Id.*)  In short, it is undisputed that Plaintiff received some form of medical treatment for his left shoulder and low back pain at all times while under Dr. Shannon's care, and that he saw a doctor, nurse, or other health care provider for this pain at least once a month every month, with the exceptions of August and September 2012.  (*Id.*)

Plaintiff nevertheless contends that Dr. Shannon was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Plaintiff's principal contention appears to be that Dr. Shannon was deliberately indifferent because he failed to follow Dr. Gossum's June 12, 2012 recommendations.  (Doc. 6 at 2-3; Doc. 33 at 1, 3.)  Dr. Gossum recommended that Plaintiff be given 1500 milligrams of Neurontin twice daily.  (Section II.A. ¶ 32, *supra*.)  Dr. Gossum also, apparently, discussed surgery with Plaintiff, but did not recommend it at that time because Plaintiff was "not interested in hearing anymore about surgical options for management of this condition.  His sole request is that he be placed back onto Neurontin."  (*Id.*)  However, Dr. Gossum did add that "[i]f any consideration is given in the future to surgical intervention," Plaintiff should see Dr. Benson at the University of New Mexico.  (*Id.*)

The relevant facts regarding this issue are undisputed.  Dr. Shannon did not follow Dr. Gossum's recommendation to give Plaintiff 1500 milligrams of Neurontin twice daily.  Rather, after receiving this recommendation, Dr. Shannon gradually increased Plaintiff's Neurontin dose from 300 milligrams to 900 milligrams twice daily, while at the same time prescribing Tylenol or ibuprofen to further treat Plaintiff's left shoulder and low back pain.  (Section II.A. ¶¶ 33-40, *supra*.)  Dr. Shannon provided medical reasons for his decision to limit Plaintiff's dose of Neurontin, specifically, that Neurontin can be used to get "high" and has a history of abuse

among NMDOC inmates, that Neurontin is typically used to address neuropathic pain while Plaintiff's pain was musculoskeletal, and that doses greater than 900 milligrams "posed an increased risk of abuse." (*Id.* ¶ 16.)

Plaintiff contends that Dr. Shannon's decision to limit his Neurontin dose to 900 milligrams was unconstitutional. (*See*, *e.g.*, Doc. 33 at 5.) In taking this position, Plaintiff is essentially arguing that he has an Eighth Amendment right to 1500 milligrams of Neurontin twice daily. However, a prisoner does not have a "right to a particular course of treatment." *Callahan*, 471 F.3d at 1160. The Tenth Circuit applied this principle in a context similar to the one presented here in *Todd v. Bigelow*, 497 F. App'x 839 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 1251 (2013). In *Todd*, the plaintiff suffered from a degenerative disorder causing hip and back pain. 497 F. App'x at 840. He was initially prescribed Neurontin to relieve the pain. *Id.* However, after he was seen "cheeking" the medication, the defendants discontinued his Neurontin prescription and prescribed another pain reliever "less prone to abuse." *Id.* at 840-41. The plaintiff alleged that the defendants' refusal to maintain his Neurontin prescription violated the Eighth Amendment. *Id.* at 841.

The *Todd* court held that the defendants' refusal to maintain the plaintiff's Neurontin prescription was not deliberately indifferent, but rather "responsive[] and appropriate[]." *Id.*

> [E]ven if the medical staff was incorrect to conclude that [the plaintiff] intended to abuse his medication, that erroneous assessment does not rise to the level of deliberate indifference. Instead, it reflects a legitimate penological interest in prevention of drug abuse.

*Id.* (internal citations omitted). The Court acknowledged the plaintiff's argument that the alternative pain reliever he received had detrimental side effects and was less effective, but nevertheless ruled that "a difference of opinion with the medical staff as to the optimal pain-management regimen does not amount to deliberate indifference." *Id.*; *see also Hood*, 180 F.

App'x at 25 (no Eighth Amendment violation where plaintiff was denied "his preferred pain medication" but an alternative, "appropriate non-narcotic medication" was offered); *Phillips v. Tiona*, 2011 WL 7277585 at *11 (D. Colo. 2011) (magistrate judge recommended holding that physician's decision to prescribe ibuprofen did not establish deliberate indifference even though previous physicians prescribed Tylenol and Neurontin), *adopted by Phillips v. Tiona*, 2012 WL 452726 (D. Colo. 2012).

As noted above, "[t]he subjective prong [of the deliberate indifference test] is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232.  In the present matter, Plaintiff has presented no evidence that Dr. Shannon's decision to prescribe a lower dose of Neurontin than Dr. Gossum recommended, and supplement it with Tylenol or ibuprofen, was anything other than an exercise of his considered medical judgment.  Nor has Plaintiff presented any evidence that Dr. Shannon acted with an extraordinary degree of neglect in making this decision.[13]  In these circumstances, as a matter of law, Dr. Shannon's decision to limit Plaintiff's Neurontin dose does not constitute deliberate indifference to Plaintiff's serious medical needs, and Plaintiff's Eighth Amendment claims against Dr. Shannon on this basis must fail.

In various motions, Plaintiff also appears to argue that Dr. Shannon was deliberately indifferent because he did not follow Dr. Gossum's recommendation to order surgery to treat Plaintiff's left shoulder pain.  (*See*, *e.g.*, Doc. 62 at 1 ("[A] shoulder specialist ordered another surgery[.  I]f the defendants [did] nothing wrong[,] why [did they] not schedule the surgery years ago?").)  This argument is also fatally flawed.  Plaintiff has presented much argument but no

---

[13] That Dr. Shannon prescribed Tylenol and ibuprofen for Plaintiff, despite Plaintiff's concerns about their safety and effectiveness, does not as a matter of law constitute "an extraordinary degree of neglect" on Dr. Shannon's part, absent evidence that these medications posed a substantial risk of harm to Plaintiff, which Dr. Shannon knew of and disregarded.  *Phillips*, 2011 WL 7277585 at *11.

evidence to refute Dr. Gossum's report, which indicates that Dr. Gossum did not recommend surgery at that time because Plaintiff refused it. (Section II.A. ¶ 32; *cf.* Doc. 62 at 1; Doc. 65 at 2; Doc. 76 at 1; Doc. 83 at 2; Doc. 84 at 4.) Nor is there any evidence that Plaintiff later informed Dr. Shannon that he had changed his mind and was ready for shoulder surgery.[14] In his sworn November 6, 2014 Motion for Summary Judgment, Plaintiff did attest that his "simple request to the defendants was to schedule the surgery[,] but no[,] they didn't." (Doc. 78 at 1.) However, this bald allegation is both conclusory and directly contradicted by Plaintiff's sworn statements in his second amended complaint indicating that he was not yet ready for surgery as late as September 2013.[15] (Doc. 33 at 4.) As such, it is insufficient to create a genuine issue of material fact. Dr. Shannon cannot be accused of even neglect, much less conduct akin to criminal recklessness, in acceding to Plaintiff's decision to refuse or indefinitely delay elective surgery. *Cf. Garrett v. Stratman*, 254 F.3d 946, 948, 954-55 (10th Cir. 2001) (affirming denial of summary judgment where orthopedist recommended surgery but plaintiff did not see surgeon for eleven months). In these circumstances, there is no genuine issue as to any material fact and Dr. Shannon is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims based on Dr. Shannon's failure to schedule shoulder surgery.

---

[14] Plaintiff did write inmate informal complaints and grievances dated July 18, 2012 and July 28, 2012, in which he requested surgery for his *low back*, because he hurt it by "sleep[ing] wrong." (Section II.A. ¶¶ 36, 39, *supra*.) However, there is no record evidence that Dr. Shannon ever received these complaints and grievances; and even if he did, Dr. Shannon's decision not to order low back surgery for pain caused by "sleep[ing] wrong" constitutes mere disagreement between Dr. Shannon and Plaintiff regarding an appropriate course of treatment, and does not rise to the level of deliberate indifference. *Self*, 439 F.3d at 1231; *Perkins*, 165 F.3d at 811; *Hood*, 180 F. App'x at 25; *Barron*, 122 F. App'x at 419; *Callahan*, 471 F.3d at 1160; *Ledoux*, 961 F.2d at 1537.

[15] Read broadly, it is possible to construe Plaintiff's second amended complaint to allege that Defendants unconstitutionally refused his requests to schedule shoulder surgery on the indefinite, future date when Plaintiff would be ready to have it. (Doc. 33 at 1, 3-5.) However, to schedule a surgery on an indefinite, future date is impossible, and thus a rational trier of fact could not find that Defendants were deliberately indifferent for failing to do it.

In addition to his contentions regarding Neurontin and surgery, Plaintiff takes issue with various other aspects of the medical care he received at PNM.  Thus, he argues that Dr. Shannon did not order all of the x-rays, consultations, or physical therapy he requested.  (Doc.  62 at 1; Doc. 83 at 1.)  However, even if true, these allegations are classic examples of disagreement between a prisoner and a prison physician regarding what course of treatment should be provided, and as a matter of law do not rise to the level of deliberate indifference.  *Self*, 439 F.3d at 1231; *Perkins*, 165 F.3d at 811; *Hood*, 180 F. App'x at 25; *Barron*, 122 F. App'x at 419; *Callahan*, 471 F.3d at 1160; *Ledoux*, 961 F.2d at 1537.

Plaintiff also asserts that he submitted sick call slips to unidentified persons for which he was not seen, that unidentified prison personnel took away his therapy band during a "shake down," and that unidentified persons did not always provide him with analgesic balm as prescribed.  (Doc. 59 at 1, 3; Doc. 62 at 1; Doc. 78 at 4; Doc. 83 at 1.)  These allegations, even if true, do not establish a genuine issue of material fact regarding whether *Dr. Shannon* violated Plaintiff's constitutional rights, absent any evidence that Dr. Shannon knew Plaintiff was not receiving his prescribed treatment and failed to reasonably respond.  *See Duffield*, 545 F.3d at 1239 (alleged failure to receive injections was immaterial because plaintiff produced "no evidence that the doctors *knew* he was not receiving the prescribed treatment") (emphasis in original).

Finally, to the extent Plaintiff alleges that any delays in the treatment Dr. Shannon provided violated his Eighth Amendment rights, he has presented no evidence that such delays caused him substantial harm.  *Mata*, 427 F.3d at 751.  There is certainly no medical evidence that Plaintiff suffered a lifelong handicap or other permanent loss because of delays in any of the treatment Dr. Shannon provided.  *Id.*  Moreover, although "considerable pain" may constitute

substantial harm, *id.*, it is undisputed that Plaintiff complained of left shoulder or low back pain on virtually every health care request form and at almost every appointment at issue in this case, regardless of what treatment he was provided, what medication he was prescribed, or what dose of medication he received.  (*See generally* Section II.A., *supra*.)  As such, and particularly because Plaintiff was never without some form of treatment, a rational trier of fact could not find that a delay in any particular treatment Dr. Shannon provided was the cause of considerable pain. For all of the above reasons, Dr. Shannon is entitled to summary judgment on all of Plaintiff's Eighth Amendment claims against him.

### 2.      Dr. Barry Beaven

Dr. Beaven also argues that he is entitled to summary judgment on Plaintiff's Eighth Amendment claims against him because, as a matter of law, he was not deliberately indifferent to Plaintiff's serious medical needs.  (Doc. 58 at 12-14.)  From September 11, 2012, when Plaintiff transferred to CNMCF, to the filing of Plaintiff's second amended complaint on September 24, 2013, the undisputed record evidence shows that Dr. Beaven provided, or was aware that others provided, Plaintiff with back exercises and regularly renewed prescriptions for non-narcotic pain relievers, including analgesic balm, Naprosyn, and ibuprofen to treat his shoulder and low back pain.  (Section II.A. ¶¶ 41-60, *supra*.)  Plaintiff has also failed to dispute that Dr. Beaven prescribed various but not continuous doses of Neurontin, including 900 milligrams twice daily from September 11, 2012 to February 21, 2013, and 300 milligrams twice daily until March 3, 2013.  (*Id.*)  As at PNM, it is undisputed that Plaintiff was receiving some form of treatment for his left shoulder and low back pain at all times from September 11, 2012 to September 24, 2013, and he saw a doctor, nurse, or other health care provider for this pain at least once a month every month from September 2012 to May 2013, and also in July 2013.  (*Id.*)

Plaintiff nevertheless contends that Dr. Beaven was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.   Again, Plaintiff's central contention appears to be that Dr. Beaven was deliberately indifferent because he failed to follow Dr. Gossum's recommendations, (Doc. 6 at 2-3; Doc. 33 at 1, 3), and again, the relevant facts are undisputed.   Dr. Beaven, like Dr. Shannon, did not follow Dr. Gossum's recommendation to give Plaintiff 1500 milligrams of Neurontin twice daily.   Instead, Dr. Beaven initially renewed Plaintiff's prescription for 900 milligrams of Neurontin twice daily, and also prescribed ibuprofen to treat Plaintiff's left shoulder and low back pain.   (Section II.A. ¶¶ 42-46, *supra.*) When Plaintiff demonstrated behaviors that Dr. Beaven reasonably believed to be drug-seeking and disclosed cravings to abuse drugs, Dr. Beaven decreased Plaintiff's Neurontin dose to 300 milligrams twice daily, (*id.* ¶ 54); and, when Plaintiff overdosed on several other prescription medications he had saved, Dr. Beaven discontinued the Neurontin prescription entirely.   (*Id.* ¶ 55.)

Plaintiff contends that Dr. Beaven's decisions to limit and then discontinue his Neurontin prescription were unconstitutional.   In taking this position, Plaintiff is again arguing that he has an Eighth Amendment right to 1500 milligrams of Neurontin twice daily.   However, this argument is no more valid as to Dr. Beaven than it was as to Dr. Shannon.   As discussed in Section II.B.1, *supra*, a prisoner does not have a "right to a particular course of treatment," *Callahan*, 471 F.3d at 1160, and more specifically does not have a right to a preferred pain medication.   *Todd*, 497 F. App'x at 840-41; *Hood*, 180 F. App'x at 25*; Phillips*, 2011 WL 7277585 at *11.   Plaintiff's appearance of drug-seeking and his subsequent overdose provided Dr. Beaven with sound, perhaps even imperative, medical reasons to limit and then discontinue Plaintiff's Neurontin prescription. These decisions were indisputably exercises of Dr. Beaven's

considered medical judgment and can in no way be said to demonstrate an extraordinary degree of neglect, notwithstanding Dr. Gossum's recommendation of a higher Neurontin dose. *Self*, 439 F.3d at 1232. Thus, as a matter of law, Dr. Beaven's decisions to limit and discontinue Plaintiff's Neurontin do not constitute deliberate indifference to Plaintiff's serious medical needs, and Plaintiff's Eighth Amendment claims against Dr. Beaven on this basis must fail.

Plaintiff also argues that Dr. Beaven was deliberately indifferent to his serious medical needs because he failed to follow Dr. Gossum's recommendation to order surgery on Plaintiff's left shoulder. (Doc. 62 at 1; Doc. 78 at 1.) As discussed in Section II.B.1., *supra*, this argument is fatally flawed. Like Dr. Shannon, Dr. Beaven cannot be accused of consciously disregarding Plaintiff's serious medical needs by acceding to Plaintiff's decision to refuse or indefinitely delay elective surgery; and, there is no evidence that Plaintiff, after refusing surgery in June 2012, later told Dr. Beaven that he had changed his mind and was ready to have surgery. (Section II.A. ¶¶ 32, 60.) On the contrary, by September 24, 2013, when Plaintiff filed his second amended complaint against Dr. Beaven, Plaintiff was still making a statement under oath indicating that he was not yet ready for surgery. (*Id.*)

Nor has Plaintiff presented any credible evidence that he told Dr. Beaven that he was ready to have surgery even *after* filing his second amended complaint. Plaintiff did produce a handwritten note to an unidentified person date-stamped December 30, 2013, in which he requested x-rays, pain medication, and surgery for his left shoulder. (Section II.A. ¶ 59, *supra*.) However, there is no evidence that Dr. Beaven (or indeed anyone else) ever received this note or knew about its existence. (*Id.*) Nor can Dr. Beaven be charged with the knowledge that Plaintiff wanted surgery based on Plaintiff's erroneous arguments in his pleadings that Dr. Gossum actually ordered surgery. (*See* Doc. 62 at 1; Doc. 65 at 2; Doc. 76 at 1; Doc. 83 at 2; Doc. 84 at

4.)  Plaintiff did directly ask for shoulder surgery in a September 30, 2014 letter to this Court. (Doc. 71 at 2.)  However, even if Dr. Beaven immediately became aware of this letter's request, which seems unlikely, he cannot be found deliberately indifferent for failing to fulfill it in the fifteen days before Plaintiff was transferred to NENMCF on October 15, 2014.  (Doc. 74.)

In these circumstances, there is no genuine issue as to any material fact and Dr. Beaven is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims based on Dr. Beaven's failure to order surgery.

Plaintiff also takes issue with various other aspects of the medical treatment he received at CNMCF.  These assorted allegations are identical to those already discussed regarding Dr. Shannon, *i.e.*, that Dr. Beaven did not order all of the x-rays, consultations, and physical therapy Plaintiff requested, that Plaintiff submitted sick call slips for which he was not seen, that prison personnel took away his therapy band, and that he did not always receive the analgesic balm he was prescribed.  (Doc. 59 at 1, 3; Doc. 62 at 1; Doc. 78 at 4; Doc. 83 at 1.)  As discussed in Section II.B.1., *supra,* these allegations, even if true, do not as a matter of law demonstrate deliberate indifference on the part of Dr. Beaven.  *Self*, 439 F.3d at 1231; *Perkins*, 165 F.3d at 811; *Hood*, 180 F. App'x at 25; *Barron*, 122 F. App'x at 419; *Callahan*, 471 F.3d at 1160; *Ledoux*, 961 F.2d at 1537; *Duffield*, 545 F.3d at 1239.  Finally, to the extent Plaintiff alleges that any delays in the treatment Dr. Beaven provided violated his Eighth Amendment rights, he has presented no evidence that such delays caused him substantial harm, for the reasons discussed in Section II.B. *supra*, which apply to both Dr. Shannon and Dr. Beaven.  *Mata*, 427 F.3d at 751. For all of the above reasons, Dr. Beaven is entitled to summary judgment on all of Plaintiff's Eighth Amendment claims against him.

### III.  Plaintiff's Pending Motions

In light of the Court's recommendation that Dr. Shannon and Dr. Beaven be granted summary judgment on all of Plaintiff's Eighth Amendment claims against them, the thirteen pending motions Plaintiff filed after Defendants' summary judgment motion have been rendered moot.  Plaintiff's three motions for trial, four motions for summary judgment, two motions for injunctive relief,[16] two motions to appoint counsel, motion for a ruling, and motion for a telephonic hearing should therefore be denied.

### IV.  Conclusion

The Court recommends that the *Martinez* Report and Motion for Summary Judgment by Defendants Dr. Barry Beaven and Dr. William Shannon (Doc. 58) be GRANTED, because, as a matter of law, these Defendants were not deliberately indifferent to Plaintiff's serious medical needs in their treatment of his left shoulder and low back pain.  In light of this recommendation, the Court further recommends that the following motions be DENIED AS MOOT:  Plaintiff's Motion for Jury Trial (Doc. 61); Plaintiff's Motion for Summary Judgment (Doc. 62); Plaintiff's Motion to Request a Trial (Doc. 65); Plaintiff's Motion to Address Medical Care and Concerns (Doc. 67); Plaintiff's Motion for Preliminary Injunction (Doc. 68); Plaintiff's Motion for Appointment of Counsel (Doc. 73); Plaintiff's Motion for Ruling (Doc. 76); Plaintiff's Motion for Summary Judgment (Doc. 78); Plaintiff's Motion for Summary Judgment (Doc. 79); Plaintiff's Motion to Set Trial Date (Doc. 83); Plaintiff's Motion for Summary Judgment (Doc. 84); Plaintiff's Motion for Appointment of Counsel (Doc. 85); and, Plaintiff's Motion for Telephonic Hearing (Doc. 86).

---

[16] Plaintiff's motions for injunctive relief are also moot because Plaintiff has not asserted any claims against a defendant who provides or controls the provision of medical care at NENMCF, the facility where he is currently incarcerated.  *See Jordan v. Sosa*, 654 F.3d 1012, 1027 (10th Cir. 2011) (transfer between prisons moots claims for declaratory and injunctive relief against officials at former prison); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (same).

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE